# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**WILMER NEGRON JIMENEZ, et al.,**
**Plaintiffs,**

**v.**

**HERIBERTO RODRIGUEZ-ADORNO, et al.,**
**Defendants.**

**Civil No. 06-1055 (ADC)**

## OPINION AND ORDER

Plaintiffs, Wilmer Negrón-Jiménez ("Negrón"), Carmen M. Agosto-Figueroa ("Agosto"), Magdalena Navarro-Adorno ("Navarro"), Luz S. Velázquez-Jiménez ("Velázquez"), Sonia N. Dávila-Negrón ("Dávila"), Adolfo Torres-Torres ("Torres"), Carlos R. Otero-Barreto ("Otero"), Abel Y. Soto-Miranda ("Soto"), Iris Nereida Sotomayor-Negrón ("Sotomayor"), Wanda I. Rosario-Paz ("Rosario"), Pedro L. Cruz-Salgado ("Cruz-Salgado"), María Cruz-Colón ("Cruz-Colón"), Emmanuel Hernández-Dávila ("Hernández"), María L. López-Ortíz ("López"), José R. Sánchez-Vangas ("Sánchez"), Yolanda Borres-Nazario ("Borres"), Carmelo Marrero-Ortíz ("Marrero"), and Heriberto Santiago-Soto ("Santiago") (collectively, "plaintiffs"),[1] filed suit against defendants, Mayor Heriberto Rodríguez-Adorno ("Rodríguez-Adorno" or "the Mayor"), the Municipality of Morovis, Puerto Rico (the "Municipality") and various unnamed defendants (collectively, "defendants"), seeking

---

[1] Orlando Sastre-Negrón ("Sastre"), his wife Margarita Rodríguez-Rivera ("Rodríguez-Rivera") and their Conjugal Partnership were among the originally named plaintiffs. However, defendants moved to dismiss the same for failing to prosecute their claims. **Docket No. 28-2**, at 42. Plaintiffs failed to respond. The Chief Magistrate-Judge recommended dismissal of said claims, and plaintiffs do not object to this recommendation. The court is fully satisfied with said recommendation. Accordingly, the claims by Sastre, Rodríguez-Rivera and their Conjugal Partnership are **DISMISSED WITH PREJUDICE**.

Additionally, the names of the other spousal plaintiffs are as follows: Lisa M. Soto-Diclet, Enrique Vega de Jesús, José L. Jiménez-Nevárez, Nancy Santiago-Delgado, Angel M. Torres-Collazo and the Conjugal Partnerships that they share with the primary plaintiffs. Hereafter, the term "plaintiffs" refers only to the former employees of the Municipality.

declaratory and injunctive relief, back and front pay, as well as compensatory and punitive damages related to defendants' allegedly discriminatory employment decisions.

Now before the court is the Report and Recommendation ("R & R") issued by the Chief Magistrate-Judge Justo Arenas ("Chief Magistrate-Judge") on June 23, 2008, plaintiffs' objections thereto, and defendants' response to plaintiffs' objections. **Docket Nos. 64, 67, 71**. After conducting a thorough examination of the record, the court **ADOPTS** the R & R in full. Thus, defendants' motion for summary judgment is **GRANTED**.

## I.    Procedural Background

Plaintiffs filed their complaint on January 17, 2006, and filed an amended complaint on January 30, 2006. **Docket Nos. 1, 3**. In the amended complaint, plaintiffs argue that they were impermissibly terminated due to their political affiliations in violation of the First, Fifth, Ninth, Tenth and Fourteenth Amendments to the U.S. Constitution.[2] **Docket No. 3**. Plaintiffs also petitioned the court to assert supplemental jurisdiction over their Commonwealth claims brought pursuant to P.R. Laws Ann. tit 29, § 146 *et seq.* ("Law 100"), and P.R. Laws Ann. tit. 31, §§ 5141 ("Article 1802") and 5142 ("Article 1803"). *Id.*

On August 10, 2007, defendants moved for summary judgment on the basis that: (1) plaintiffs had failed to produce any evidence that defendants' employment related decisions were based on discriminatory animus; (2) plaintiffs had no expectation of continued employment or propriety interest in their positions; and (3) defendants are entitled to qualified immunity. **Docket No. 28**. Plaintiffs' opposed said motion. **Docket No. 46**. On February 15, 2008, defendants filed a reply to plaintiffs' opposition to summary judgment

---

[2]  Defendants moved for summary judgment regarding plaintiffs' Fifth Amendment claim. Though the R & R addresses the plaintiffs' due process claim in the context of the Fourteenth Amendment, it does not make a specific recommendation regarding plaintiffs' Fifth Amendment claim. Notwithstanding, plaintiffs cannot bring a Fifth Amendment claim against defendants since the Fifth Amendment applies only to claims asserted against the federal government, not against private individuals, or states. *Gerena v. P.R. Legal Serv. Inc.*, 697 F.2d 447, 449 (1st Cir. 1983) (citing *Pub. Util. Commi'n v. Pollak*, 343 U.S. 451, 461 (1952)). Since plaintiffs' claims are alleged against defendants in their personal capacities and as agents of the Municipality, such a claim is inappropriate. Therefore, plaintiffs' Fifth Amendment claim is **DISMISSED WITH PREJUDICE.**

which was supported by citation to exhibits in the Spanish language. **Docket No. 56.** The court granted defendants leave to file English language translations within thirty (30) days. **Docket No. 58**. Defendants failed to submit the same.

On March 17, 2008, the court referred the motion for summary judgment to the Chief Magistrate-Judge for a report and recommendation. **Docket No. 61**. The R & R, issued on June 23, 2008, recommended granting defendants' motion on the following grounds: (1) plaintiffs' First Amendment claims should be dismissed because fourteen (14) of the eighteen (18) plaintiffs failed to plead a *prima facie* case, as none could show that Rodríguez-Adorno was aware of their political affiliations, and the remaining plaintiffs failed to refute defendants' legitimate non-discriminatory reason for not renewing their employment contracts; (2) plaintiffs' Fourteenth Amendment claims should be dismissed inasmuch as plaintiffs have no property interest in continued employment; (3) defendants are not entitled to qualified immunity; and (4) the court should decline to exercise supplemental jurisdiction over plaintiffs' Commonwealth claims.

Plaintiffs object to some of these findings, asserting that the R & R: (1) wrongly decided their First Amendment claims because it failed to consider plaintiffs' factual averments showing that Rodríguez-Adorno knew of each of the plaintiffs' political affiliations, and the non-renewal of their contracts is a pretext for political discrimination; and (2) should have exercised supplemental jurisdiction over their Commonwealth claims. The court conducts a *de novo* review of these issues.[3]

---

[3] Plaintiffs also aver that the Chief Magistrate-Judge erred in not having deemed "admitted" plaintiffs' counter-statement of uncontested facts, as defendants failed to provide the English language translations to some of the documents supporting their opposition to plaintiffs' statement of uncontested facts. **Docket No. 67,** at 17 n.5. Additional objections surround the R & R's statement of the factual background which was based upon the plaintiffs' amended complaint, as opposed to the parties' competing statements of fact. These objections are addressed inasmuch as the court has entered its own factual analysis, which, pursuant to Loc. Cv. R. 56(e), disregards all of the factual averments contained in defendants' opposition to plaintiffs' statement of uncontested facts (**Docket No. 56-2**) which do not properly cite to the record. However, the court "safely ignores conclusory allegations, improbable inferences, and unsupported speculation," *Suárez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000), and "[e]vidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on

## II.      Factual Background

According to the 2000 U.S. Census, the Municipality has an estimated population of nearly thirty thousand (30,000) people.  Plaintiffs' Statement of Uncontested Fact ("PSUF"), **Docket No. 48**, at ¶ 2; Defendants' Opposition to Plaintiffs' Statement of Uncontested Facts ("DOPSUF"), **Docket No. 56-2**, at ¶ 2 .  As a result of the general elections, in a very close race held on November 2, 2004, the government of the Municipality changed from one controlled by a Mayor affiliated with the Popular Democratic Party ("P.D.P."), to one controlled by a Mayor affiliated with the New Progressive Party ("N.P.P.").  Defendants' Statement of Uncontested Facts ("DSUMF"), **Docket No. 28-3**, at ¶ 1; Plaintiffs' Opposition to Defendants' Statement of Uncontested Facts ("PODSUMF"), **Docket No. 47**, at ¶ 1.  Rodríguez-Adorno was sworn-in as Mayor on January 10, 2005.  DSUMF, at ¶ 1; PODSUMF, at ¶ 1; PSUF, at ¶ 4.

Plaintiffs are all self-described "well-known political activists" of the P.D.P.  PSUF, at ¶¶ 6, 13, 19, 23, 30, 36, 41, 46, 50, 55, 59, 64, 70, 74, 78, 82, 86, 89.  At the time they stopped working for the Municipality, plaintiffs had been appointed to non-permanent positions, as either transitory, or irregular employees, or in one case, pursuant to a professional services contract.  In all cases except three (3), those of Agosto, Navarro and Velázquez (whom had all signed year-long contracts with the Municipality), continued employment required the Municipality to extend each of the plaintiffs' appointments.  PSUF, at ¶¶ 9, 16, 21, 28, 34, 39, 44, 48, 53, 58, 62, 67, 73, 76, 80, 85, 88, 91.  All of the plaintiffs, except the year-long contract employees, had their appointments renewed more than once, prior to Rodríguez-Adorno taking office, and were told that their appointments could no longer be renewed, after Rodríguez-Adorno took office.[4]  PSUF, at ¶¶ 9, 16, 21, 28, 34, 39, 44, 48, 53, 58, 62, 67, 73, 76, 80, 85, 88, 91.  Finally, none of the plaintiffs, except Torres, Borres, Cruz-Salgado and Cruz-

---

summary judgment."  *Vázquez v. López-Rosario*, 134 F.3d 28, 33 (1st Cir. 1998).

[4] Plaintiffs and defendants dispute whether the fact that each plaintiff no longer works for the Municipality, constitutes a "non-renewal" of their appointments or an "active decision not to renew" the same, which, plaintiffs attest, is equivalent to termination. DSUMF, at ¶ 2; PODSUMF, at ¶ 2.

Colón, offer evidence that Rodríguez-Adorno had first-hand knowledge of their affiliations with the P.D.P.  Rather, they offer evidence that he "must have known" because of his deposition testimony that "there are always people in the neighborhoods who know what political affiliation is each . . . person."  PSUF, at ¶ 5.  They combine this assumed knowledge with their testimonies that he was aware of their political affiliations because of either: (1) their relationships to third parties; (2) having been seen, or, for that matter, met him during a routine campaign activity; (3) having been visited by the Rodríguez-Adorno while he was a candidate for Mayor; (4) political propaganda was adhered to either their cars and/or homes; (5) various other highly speculative means such as the fact that they lived in the same neighborhood growing up, or that he failed to greet them during a meeting; and (6) connections to the Mayor, such as having delivered groceries to his home, or being a distant relative.

### A.    Negrón

It is undisputed that Negrón began working at the Municipality as an irregular employee on October 7, 2003.  DSUMF, at ¶ 2; PODSUMF, at ¶ 2.  He was reappointed on July 1, 2004, to a Clerk I position.  DSUMF, at ¶ 2; PODSUMF, at ¶ 2.  His appointment concluded on January 15, 2005.  DSUMF, at ¶ 2; PODSUMF, at ¶ 2. After January 15, 2005, Negrón was offered appointments to one of the numerous positions the Municipality sought to fill, which he turned down.  DSUMF, at ¶¶ 4-5.  Plaintiffs add that the positions offered were for "less work time and money."  PODSUMF, at ¶ 4-5.

Plaintiffs assert that Rodríguez-Adorno is aware of Negrón's political affiliation because Carmen Lydia-González knows it, in that she impeached his competence to vote in the Municipality, and because Negrón has had political conversations with the Mayor's brother-in-law.  PSUF, at ¶ 8.  Negrón also states that on one occasion a person on the street alluded to being his replacement, and that after he stopped working for the Municipality he saw this man performing his old job.  PSUF, at ¶ 11.

### B.    Agosto

Agosto worked as a Worker I for Ronda de Niños, a day-care center administered by the Office of Children Services and Community Development. DSUMF, at ¶ 7; PODSUMF, at ¶ 7. Her original appointment began on October 7, 2003. PODSUMF, at ¶ 7. This transitory appointment was extended several times. **Docket No. 38-3**, Ex. 2-B, at 3-30. The last extension was dated December 23, 2003, and explained that Agosto's employment agreement was extended to be effective from January 1, 2004, to January 31, 2004, and was subject to available funds. DSUMF, at ¶ 12; PODSUMF, at ¶ 12. Notwithstanding these individual extensions of Agosto's temporary employment, she received a letter dated September 28, 2004, which explained that her appointment was to be extended from October 1, 2004, to September 30, 2005, subject to the availability of funds. **Docket No. 38-3**, Ex. 2-U, at 41. Agosto stated in her deposition that she signed a contract memorializing this extension. *Id*. Additionally, Agosto received a final letter, dated January 26, 2005, stating that, notwithstanding the letter dated September 28, 2004, the Municipality was "terminating [her] appointment" effective January 31, 2005. **Docket No. 38-3**, Ex. 2-V, at 42.

Plaintiffs aver that, though Agosto does not know the Mayor, her husband had known him very well, and that her daughter had been President of the P.D.P. Youth "at state level." PODSUMF, at ¶ 10. Agosto states that the Mayor knew of her political affiliation because Margarita-Barzana, a well-known N.P.P. activist, whom she has known since she was young, visited the house of her neighbor during the election period, while Agosto's house had P.D.P. propaganda adorning it. PODSUMF, at ¶ 15. Agosto claims that she can identify her replacement as an N.P.P. affiliated person. PODSUMF, at ¶ 18.

### C.    Navarro

Navarro began working as a Caretaker at Ronda de Niños on April 14, 2004, and she received monthly extensions of her appointment. DSUMF, at ¶ 17; PODSUMF, at ¶ 17. The last of these was effective as of January 1, 2005, until January 31, 2005. **Docket No. 38,** Ex. 3-A. Notwithstanding these appointments, Navarro, like Agosto, also received two (2) letters. The first, dated September 28, 2004, stated that her temporary appointment had been

extended from October 1, 2004, until September 20, 2005. *Id.* at Ex. 3-M. The second stated that, notwithstanding the previous communication extending her temporary appointment, "subject to the availability of funds," her employment was to be terminated as of January 31, 2005. *Id.* at Ex. 3-N.

Navarro avers that she knows she was terminated due to political discrimination because "[she] was working . . . [as] an officer of the polling station, . . . participated in several meetings, and [she] was in . . . the whole campaign of the mayor, [she] was present. As soon as [the new Mayor] occupied the position . . . I was dismissed." **Docket No. 38-4**, Ex. 3-B, at 6. Navarro also states that she is a "distant cousin" to Rodríguez-Adorno. *Id.* Regarding her evidence that she was replaced by a member of the N.P.P., she claims that "[she has] been told that [her] position . . . was subsequently filled with an active member of the N.P.P." **Docket No. 48-3**, Ex. 2, at 8.

### D.    Velázquez

Velázquez was hired to work as the Director of Ronda de Niños under a professional services contract, entered into on October 18, 2004. DSUMF, at ¶ 21; PODSUMF, at ¶ 21. The contract stated that its effective dates were from October 18, 2004, until September 30, 2005. DSUMF, at ¶ 21; PODSUMF, at ¶ 21. Defendants argue that "[t]he record is bereft of any waiver from ORHELA to proceed with the professional services contract . . . ." DSUMF, at ¶ 24. Plaintiff denies this statement and asserts that "it appears that the proposal request for the funds needed to operate SENDEC was submitted on August 12, 2004." PODSUMF, at ¶ 24. Velázquez was notified by letter, dated January 12, 2005, that her contract would be canceled effective February 28, 2005. DSUMF, at ¶ 26; PODSUMF, at ¶ 26.

Plaintiff asserts that Velázquez was replaced by Carmen Margarita-Barzana, a "known N.P.P. affiliate," who took over her position even before she stopped working. PSUF, at ¶¶ 27, 29. She also claims that her political affiliation is known to Rodríguez-Adorno because her daughter is a well-known P.D.P. activist, and N.P.P. activists live in her neighborhood and likely could have seen her home adorned with P.D.P. propaganda. PSUF, at ¶¶ 24-26. She also states that she knows that she has been subject to political discrimination because she was told by Rodríguez-Adorno's uncle that she would be dismissed because she was affiliated

with the P.D.P.  PSUF, at ¶¶ 24-26.

### E.   Dávila

Dávila worked as a Worker I at the recycling center in the Municipality, beginning on August 7, 2003, pursuant to a grant made possible by P.R. Laws Ann. tit. 29, § 711c (a "Law 52" grant).  DSUMF, at ¶ 27; PODSUMF, at ¶ 27.  Dávila's appointment had been extended numerous times such that it was to last until May 23, 2006.  DSUMF, at ¶¶ 28-29.  Plaintiffs point out that the only reason her appointment was extended was because she had suffered two (2) separate work related injuries during the period of May 30, 2005, to March 21, 2006.  DSUMF, at ¶ 29; PODSUMF, at ¶¶ 28, 29.

When asked why she believes that she suffers from political discrimination, she responded that she and four (4) other P.D.P. affiliated co-workers, employed pursuant to Law 52 even longer than she, had not had their contracts renewed.  **Docket No. 38-6**, Ex. 5-H, at 11-12.  Additionally, she claims that her replacement was a woman named Carmen, whom she identifies as supporting the N.P.P. because she has seen her at N.P.P. related activities.  PSUF ¶ 35; DOPSUF ¶ 35.  Dávila also states that Rodríguez-Adorno knows her political affiliation because he grew up in the neighborhood in which she now lives; her husband drives the "sound bus" in support of the P.D.P., among other activities; she adorns her house with P.D.P. propaganda; and that co-workers affiliated with the N.P.P., such as Diana Vega, used to mock P.D.P. supporters with the saying "out is where you are going."  PSUF, at ¶¶ 30-33; DOPSUF, at ¶¶ 30-33.

### F.   Torres

Torres was employed as a heavy vehicle driver beginning October 22, 2002, in a transitory appointment, under a Law 52 grant.  DSUMF, at ¶ 37; PODSUMF, at ¶ 37.  His appointment was renewed on August 3, 2003, July 20, 2004, and January 3, 2005.  DSUMF, at ¶ 38; PODSUMF, at ¶ 38.  On June 1, 2005, Torres received a letter stating that because he was employed under Law 52, his appointment could no longer be renewed.  DSUMF, at ¶ 39; PODSUMF, at ¶ 39.  Torres was a transitory employee for more than thirty-one (31) months.  DSUMF, at ¶ 42; PODSUMF, at ¶ 42.

Torres states that the reason he believes his affiliation to the P.D.P. is known by the

Mayor is because Torres belongs to a family who are all members of the P.D.P., and once, in 1997 or 1998, the Mayor said to him, as he welcomed him into his office, "come here popular." PSUF, at ¶ 38.  His declaration attests to the facts that he told his political affiliation to N.P.P. activists and officers such as Nelson Ruiz-Otero, who lives in his neighborhood, and Diego Ortíz-Morales.  PSUF, at ¶¶ 37-38; DOPSUF, at ¶¶ 37-38.  He further states that his position is now occupied by "Papote" and José "Cacho," both of whom are affiliated with the N.P.P., which he knows because he has seen them participating in N.P.P. activities.  PSUF, at ¶ 40; DOPSUF, at ¶ 40.

### G.    Otero

Otero was appointed to the transitory position of Office Clerk I, on October 2, 2003, under a Law 52 grant.  DSUMF, at ¶ 43; PODSUMF, at ¶ 43.  Otero's appointment was renewed monthly through July 17, 2004, at which time he was given a transitory appointment, effective until January 15, 2005.  DSUMF, at ¶ 44; PODSUMF, at ¶ 44.  On January 14, 2005, Rodríguez-Adorno wrote Otero a letter informing Otero, who was on medical leave at the time, that his appointment would end on January 15, 2005, and would not be renewed as the new administration had to reallocate resources.  DSUMF, at ¶ 45; PODSUMF, at ¶ 45.

Otero asserts that his political affiliation is known to Rodríguez-Adorno because the Mayor's wife, Norma Iris Santos-Otero, is his cousin, and his father has held P.D.P. rallies at his store in the past.  PSUF, at ¶¶ 42-43; DOPSUF, at ¶¶ 42-43.

### H.    Soto

Soto was a transitory employee appointed under a Law 52 grant on October 25, 2002. DSUMF, at ¶ 48; PODSUMF, at ¶ 48.  His appointment was renewed on August 1, 2003, July 10, 2004, and January 3, 2005.  DSUMF, at ¶ 50; PODSUMF, at ¶ 50.  A letter was sent to Soto, dated June 1, 2005, informing him that his appointment would not be renewed because his transitory appointment under Law 52 had exceeded the legal limit.  DSUMF, at ¶ 51; PODSUMF, at ¶ 51.  Soto was employed under a Law 52 grant for nearly thirty-two (32) months. DSUMF, at ¶ 55.

Soto bases his claim of political discrimination upon the contention that he never had

a problem in his work and that he is affiliated with the P.D.P.  DSUMF, at ¶ 53; PODSUMF, at ¶ 53.  When asked whether the Mayor personally knows him, Soto answers that "he is (the Mayor) the [only] one who can answer that" and when questioned whether he has ever talked with Rodríguez-Adorno, Soto answers "[n]o, sit down and talk no."  **Docket No. 38-7**, Ex. 8-H, at 16-17.  He asserts that his political affiliation is known to Carmen Negrón-Guzman, who is an N.P.P. activist, and that his position has been filled by a man named Omar, whom Soto knows is affiliated with the N.P.P. because he went to school with Omar and has seen him at N.P.P. activities.  PSUF, at ¶¶ 47, 49;  DOPSUF, at ¶¶ 47, 49.

> **I.     Sotomayor**

Sotomayor was appointed as a transitory employee, under a Law 52 grant, on October 10, 2002, and assigned to the emergency Disaster Management Office.  DSUMF, at ¶ 56; PODSUMF, at ¶ 56.  This appointment was extended on August 1, 2003, and July 20, 2004. DSUMF, at ¶ 57; PODSUMF, at ¶ 57.  On June 1, 2005, Sotomayor received a letter informing her that her appointment, ending June 30, 2005, would not be renewed as it had exceeded its limit under Law 52.  DSUMF, at ¶ 58; PODSUMF, at ¶ 58.   She had been working in the above mentioned transitory position for nearly thirty-one (31) months.  DSUMF, at ¶ 60; PODSUMF, at ¶ 60.  Plaintiffs assert that Sotomayor's political affiliation is known by N.P.P. activist and municipality appointee Diego Ortíz-Morales, whom once asked her why she did not quit prior to being fired, and Carmen Negrón-Guzman.  PSUF, at ¶¶ 51-52, 54; DOPSUF, at ¶¶ 51-52, 54; PSUF, at ¶ 54.  In her declaration, she claims that when she confronted the Mayor regarding the letter of non-renewal, she was mocked by him and his assistant, and then dismissed.  PSUF, at ¶ 52; DOPSUF, at ¶ 52. She states that she was replaced by an N.P.P. activist named Carmen. PSUF, at ¶ 54.

> **J.     Rosario**

Rosario was originally appointed to a transitory position under a Law 52 grant, as a Worker I, on February 15, 2001.  DSUMF, at ¶ 62; PODSUMF, at ¶ 63.  She received a similar appointment again on November 18, 2002, which  was renewed on August 1, 2003, July 20, 2004, and January 3, 2005.  DSUMF, at ¶ 64; PODSUMF ¶ 64.  Rosario was sent a letter, dated

June 1, 2005, which stated that because she had held her position longer than twenty-four (24) months, her position could not be renewed past June 30, 2005. DSUMF, at ¶ 66; PODSUMF, at ¶ 66. Rosario states that on one occasion the new Mayor went to the municipal building and greeted all those who were members of the N.P.P., but did not greet either her or her co-worker because they are P.D.P. affiliates. She also stated that the Mayor is aware of her political affiliation because people know she was affiliated with the P.D.P., though no one made political comments to her between January and June of 2005. She also stated that she knows she was discriminated against because there are appointees who were not dismissed from their temporary positions, while she was and after the new administration began her co-worker's keys were taken away by Ruben Rodríguez and though she was told to come to work at six a.m. she could not get in until someone who had keys got there. **Docket No. 39-3**, Ex. 10-1, at 18-20; PSUF, at ¶ 57. Lastly, her immediate supervisor stated that he did not feel good about not renewing her employment, but since he was not the one who gave orders he had to. PSUF, at ¶ 58; DOPSUF, at ¶ 58.

> ### K.     Cruz-Salgado

Cruz-Salgado was originally appointed to the transitory position of Worker I, on October 4, 1999, until June 30, 2000. DSUMF, at ¶ 72; PODSUMF, at ¶ 72. He was later appointed to another position on September 18, 2002, under a Law 52 grant, which was extended on July 20, 2004, and again on January 3, 2005. DSUMF, at ¶ 74; PODSUMF, at ¶ 74. Cruz-Salgado received a letter, dated June 1, 2005, stating that his appointment—set to expire on June 30, 2005—would not be renewed as he had served for more than twenty-four (24) months. DSUMF, at ¶ 76; PODSUMF, at ¶ 76. In fact, he occupied the position for more than thirty-three (33) months. DSUMF, at ¶ 75; PODSUMF, at ¶ 75. As evidence that the Mayor was aware of his political affiliation, he points to an October of 2003 incident, in which the N.P.P. and P.D.P. caravans converged and the Mayor, seeing him in the other caravan, pointed to him and said "you are going out." PSUF, at ¶ 89.

> ### L.     Cruz-Colón

Cruz-Colón was appointed to the transitory position of Worker I, pursuant to a Law 52 grant, on March 2, 2001, which was extended on July 1, 2001. DSUMF, at ¶¶ 78-79;

PODSUMF, at ¶¶ 78-79.  On July 1, 2002, Cruz-Colón was appointed to an irregular position as a Worker I, which she held until April 28, 2003. DSUMF, at ¶¶ 80-81; PODSUMF, at ¶¶ 80-81. Plaintiffs assert that the position was held until February 28, 2003, instead. PODSUMF, at ¶ 81.  On August 6, 2003, Cruz-Colón was again appointed to a transitory position under a Law 52 grant, which was renewed on July 20, 2004, and January 3, 2005. DSUMF, at ¶¶ 82-83; PODSUMF, at ¶¶ 82-83.  Defendants sent Cruz-Colón a letter dated June 1, 2005, informing her that her position would not be renewed past June 30, 2005, since her appointment had surpassed the applicable limit under Law 52. DSUMF, at ¶ 84; PODSUMF, at ¶ 84. She was appointed to a transitory position for a total of thirty-seven (37) months. DSUMF, at ¶ 88; PODSUMF, at ¶ 88.

Cruz-Colón states that the Mayor knows her political affiliation because during the campaign he came to her house where she informed him that she was affiliated with the P.D.P. **Docket No. 39-3**, Ex. 12-J, at 20-22.  Additionally, in the deposition she recounted that around the time of the deposition, in March of 2007, she was at an event with the Mayor, and that persons there told him "the only thing . . . she is Popular," alluding to Cruz-Colón. *Id.*

**M.    Hernández**

Hernández was appointed to the transitory position of Worker I, under a Law 52 grant, on September 10, 2002. DSUMF, at ¶ 89; PODSUMF, at ¶ 89.  Two personnel transaction forms in Hernández' file state that his employment was to be covered by Law 52 between August 1, 2003, and June 30, 2004, as well as July 20, 2004, and January 30, 2005. DSUMF, at ¶¶ 92-93; PODSUMF, at ¶¶ 92-93.  Hernández held a transitory position under Law 52 for around thirty-two (32) months. DSUMF, at ¶ 94; PODSUMF, at ¶ 94.  Hernández received a letter, dated June 1, 2005, informing him that his appointment, expiring on June 30, 2005, would not be renewed given the fact that he had already surpassed the applicable appointment period. DSUMF, at ¶ 95; PODSUMF, at ¶ 95.

Hernández states that the Mayor knows of his political affiliation because several N.P.P. activists, including Diana Vega, Eloiza and Angel Rubén-Soto mocked him and other P.D.P. affiliates during work hours, shouting "out is where you are going." PSUF, at ¶ 65; DOPSUF, at ¶ 65. Additionally, the wife of Junior Pérez, whom, with her husband, is part of

the Mayor's "advance team," inquired as to why he was still working, since, as a P.D.P. activist, he should have been fired by then.  PSUF, at ¶ 66; DOPSUF, at ¶ 66.  He attests that he knows an N.P.P. affiliate replaced him because he overheard his co-worker say that his replacement "helped [the Mayor] during the campaign process and [] was now being rewarded for his efforts."  PSUF, at ¶ 69; DOPSUF, at ¶ 69.

### N.     López

López was appointed to a transitory position, under a Law 52 grant, on September 16, 2002, renewed on July 20, 2004.  DSUMF, at ¶¶ 97-98; PODSUMF, at ¶¶ 97-98.  López received a letter, dated June 1, 2005,  stating that her appointment, terminating on June 30, 2005, would not be renewed since it had exceeded the legally permitted amount of time.  DSUMF, at ¶ 99; PODSUMF, at ¶ 99. In all, López served thirty-three (33) months in said position. DSUMF, at ¶ 101; PODSUMF, at ¶ 101.

López has never spoken to Rodríguez-Adorno. DSUMF, at ¶ 102; PODSUMF, at ¶ 102. Though she attests that the Mayor knows of her political affiliation because her neighbor, Manuel Díaz ("Díaz"), is close to the Mayor and the propaganda that adorns her house makes her political affiliation known to all those who visit Díaz' home, including the Mayor. PSUF, at ¶ 71;  DOPSUF, at ¶ 71.  Additionally, her deceased uncle Leonardo Ortíz was a well-known P.D.P. activist, whom both Diaz and Rodríguez-Adorno knew.  PSUF, at ¶ 4; DOPSUF, at ¶ 2

### O.     Sánchez

On July 1, 2001, Sánchez was appointed under a Law 52 grant. DSUMF, at ¶ 104; PODSUMF, at ¶ 104.  Sánchez' appointment was changed to that of an irregular position on July 1, 2002. DSUMF, at ¶ 105; PODSUMF, at ¶105. On August 1, 2003, this appointment was changed again, such that it was pursuant to Law 52.  The appointment was extended on September 30, 2003, July 20, 2004, and January 3, 2005. DSUMF, at ¶¶ 106-07; PODSUMF, at ¶¶ 106-07.  On June 29, 2005, Sánchez' appointment was renewed for a final month, to terminate August 31, 2005. DSUMF, at ¶ 108.  Plaintiffs point out that defendants informed Sánchez of their intent not to renew his employment in the same letter. PODSUMF, at ¶ 108. He had served in a transitory position for more than two (2) years. DSUMF, at ¶ 111;

PODSUMF, at ¶ 111.

Sánchez has never spoken to Rodríguez-Adorno. DSUMF, at ¶ 110; PODSUMF, at ¶ 110. However, plaintiffs attest that Rodríguez-Adorno is aware of Sánchez' political affiliation because his family is politically active and he used to deliver groceries to the house of Rodríguez-Adorno before beginning to work for the municipality. PSUF, at ¶ 74; DOPSUF, at ¶ 74. Additionally, Sánchez has known José Rodríguez since they were young. PSUF, at ¶ 75; DOPSUF, at ¶ 75. The latter is an N.P.P. affiliate who was appointed as Sánchez' immediate supervisor and has knowledge of his political affiliation. PSUF, at ¶ 75; DOPSUF, at ¶ 75. Further, Sánchez has been taunted by "various N.P.P. party affiliates" saying "out is where you are going." PSUF, at ¶ 75; DOPSUF, at ¶ 75. Sánchez asserts that he was replaced by Sonia "La Bruja," whom he knows is an N.P.P. activist because she worked in the N.P.P. campaigns. PSUF, at ¶ 77; DOPSUF, at ¶ 77.

### P.    Borres

Borres was appointed to a transitory position, under a Law 52 grant, on July 31, 2003, which was renewed on July 31, 2003, July 20, 2004, January 3, 2005, and July 1, 2005. DSUMF, at ¶¶ 112-13; PODSUMF, at ¶¶ 112-14. On August 29, 2005, Borres was notified that her employment, which was set to terminate on August 31, 2005, would not be renewed. DSUMF, at ¶ 115; PODSUMF, at ¶ 114. In all, Borres was employed for nearly twenty-five (25) months. DSUMF, at ¶ 116; PODSUMF, at ¶ 116.

Borres has never met the Mayor, but states that she saw him in a competing political caravan, around the beginning of August or September of 2004, but that he did not see her. DSUMF, at ¶ 117; PODSUMF, at ¶ 117; **Docket No. 40-4**, Ex. 16-F, at 13. However, plaintiffs state that Borres' political affiliation was well-known to the Mayor because Borres knows José Castro, the Director of Human Resources, who went to school with her daughter. PSUF, at ¶ 79; DOPSUF, at ¶ 79. He also knows that Borres is affiliated with the P.D.P. as she places campaign propaganda outside her home, promoting the P.D.P. PSUF, at ¶ 79; DOPSUF, at ¶ 79. Additionally, her declaration states that while participating in a political rally, for the P.D.P., it was intercepted by a rally in which Rodríguez-Adorno was participating and he "acknowledged [her] with the P.D.P. group." PSUF, at ¶ 79; DOPSUF, at ¶ 79. Borres states

that she has been informed that she was replaced by a member of the N.P.P.  PSUF, at ¶ 81; DOPSUF, at ¶ 81.

### Q.     Marrero

Marrero was appointed to a transitory position on August 1, 2003, under a Law 52 grant.  DSUMF, at ¶ 118; PODSUMF, at ¶ 118.  This appointment was extended on July 20, 2004, and January 3, 2005.  DSUMF, at ¶ 119; PODSUMF, at ¶ 119.  Marrero received a letter, dated June 29, 2005, stating that his appointment would be renewed until August 31, 2005, at which time he would have reached the time limit permitted by Law 52 for the appointment of transitory appointees.  DSUMF, at ¶ 120; PODSUMF, at ¶ 120. Marrero was employed under a Law 52 grant for two (2) years.  DSUMF, at ¶ 122; PODSUMF, at ¶ 122.

He asserts that his political affiliation is known to Rodríguez-Adorno through Frank Rodríguez, whom is a member of the Mayor's rally team and is married to his aunt, his photograph has appeared in P.D.P. campaign advertisements, and he has P.D.P. propaganda displayed prominently on his motorcycle, which he used to drive to work and in campaign rallies. PSUF, at ¶ 84; DOPSUF, at ¶ 84.  His declaration states that his position has been filled by persons that he can identify as an N.P.P. affiliate.  PSUF, at ¶ 84; DOPSUF, at ¶ 84.

### R.     Santiago

Santiago was appointed to a transitory position on August 4, 2003, under a Law 52 grant.  DSUMF, at ¶ 123; PODSUMF, at ¶ 123.  This appointment was extended on July 20, 2004. DSUMF, at ¶ 124; PODSUMF, at ¶ 124.  Santiago received a letter, dated June 29, 2005, informing him that his appointment would be renewed until August 31, 2005, at which time he would have reached the time limit permitted by Law 52 for appointment of transitory employees.  DSUMF, at ¶ 125; PODSUMF, at ¶ 125.

He attests that his political affiliation is known to the Mayor because José Castro, the Director of Human Resources for the Municipality, lives next to Santiago's grandmother, and saw him on several occasions during P.D.P. rallies. PSUF, at ¶ 87; DOPSUF, at ¶ 87.  In his declaration Santiago attests that he has heard the person who began performing his duties after him, "openly declare that he is affiliated with the N.P.P." **Docket No. 48-3**, Ex. 2, at 43.

### III.    Applicable Standards of Review

#### A.    Standard of Review for Objections to a Report and Recommendation

A district court may refer pending dispositive motions to a magistrate-judge for a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Loc. Cv. R. 72(a). Any party adversely affected by the recommendation issued may file written objections within ten days of being served with the report and recommendation. *See* 28 U.S.C. § 636(b)(1). A party that files a timely objection is entitled to a *de novo* determination of "those portions of the report or specified proposed findings or recommendations to which specific objection is made." *Sylva v. Culebra Dive Shop*, 389 F. Supp. 2d 189, 191-92 (D.P.R. 2005) (citing *United States v. Raddatz*, 447 U.S. 667, 673 (1980)). Failure to comply with this rule may preclude further review by the district court and the court of appeals. *See Santiago v. Cannon U.S.A. Inc.*, 138 F.3d 1, 4 (1st Cir. 1998); *Davet v. Maccorone*, 973 F.2d 22, 30-31 (1st Cir. 1992). Similarly, a party objecting to a report and recommendation is "not entitled to a de novo review of an argument never raised" before the magistrate-judge. *Borden v. Sec. of Health and Human Svcs.*, 836 F.2d 4, 6 (1st Cir. 1987).

In conducting its review, the court is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate-judge." 28 U.S.C. § 636 (a)(b)(1); *see also Templeman v. Cris Craft Corp.*, 770 F.2d 245, 247 (1st Cir. 1985); *Alamo-Rodríguez v. Pfizer Pharma., Inc.*, 286 F. Supp. 2d 144, 146 (D.P.R. 2003). Hence, the court may accept those parts of the report and recommendation to which the plaintiff does not object. *See Hernández-Mejías v. General Elec.*, 428 F. Supp. 2d 4, 6 (D.P.R. 2005) (citing *Lacedra v. Donald W. Wyatt Detention Facility*, 334 F. Supp. 2d 114, 125-26 (D.R.I. 2004)).

#### B.    Summary Judgment Standard

"Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law based on the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits." *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008) (citing Fed. R. Civ P. 56(c)). When ruling on a motion for summary judgment, the court "must scrutinize the evidence in the light most agreeable to the nonmoving party, giving that party the benefit of any and all reasonable

inferences." *Cox v. Hainey*, 391 F.3d 25, 27 (1st Cir. 2004).  The court may safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Suárez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000) (quoting *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)).   In addition, the "absence of evidence on a critical issue weighs against the party—be it either the movant or nonmovant—who would bear the burden of proof on that issue at trial." *Alamo-Rodríguez v. Pfizer Pharma.*, 286 F. Supp. 2d 144, 151 (D.P.R. 2003) (citing *Pérez v. Volvo Car Corp.*, 247 F.3d 303, 310 (1st Cir. 2001)).

"A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Thompson*, 522 F.3d at 175 (internal citation and quotation marks omitted).  "A fact is material if it has the potential of determining the outcome of the litigation." *Maymí v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008).  To defeat a properly supported motion for summary judgment, evidence offered by the non-movant "must be significantly probative of specific facts." *Pérez*, 247 F.3d at 317 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  As a rule, "[e]vidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." *Vázquez v. López-Rosario*, 134 F.3d 28, 33 (1st Cir. 1998).  Finally, it is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment.  *Anderson*, 477 U.S. at 252.

## IV.     Analysis

### A.     First Amendment Claims

#### 1.     Failure to Establish a *Prima Facie* Cause of Action

The Chief Magistrate-Judge recommended that all of the plaintiffs' claims, except for those of Torres, Cruz-Colón, Borres and Cruz-Salgado, be dismissed.  This is because none could show that Rodríguez-Adorno had knowledge of their political affiliations.  Plaintiffs object, arguing that the R & R is incorrect because they have produced sufficient circumstantial evidence from which the court can reasonably infer that Rodríguez-Adorno knew the political affiliations of all of the plaintiffs.  The court disagrees.

It is well settled that plaintiffs bear the burden of producing sufficient evidence, be it through direct or circumstantial evidence, that they engaged in a constitutionally protected

conduct and that their political affiliations were the substantial or motivating factor behind the challenged adverse employment action. *See Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) ("[T]he burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a 'substantial factor' or to put it in other words, that it was a 'motivating factor' in the Board's decision not to rehire him."); *Guzmán-Ruíz v. Hernández-Colón*, 406 F.3d 31, 34 (1st Cir. 2005) ("The[] task under the burden-shifting analysis applicable to political discrimination cases [is] to show that the[] constitutionally protected conduct was a substantial or motivating factor for the adverse employment decision."); *González-De-Blasini v. Family Dep't*, 377 F.3d 81, 85 (1st Cir. 2004) (same); *Cosme-Rosado v. Serrano-Rodríguez*, 360 F.3d 42, 47 (1st Cir. 2004) (same). Accordingly, plaintiffs are obligated to point to "to evidence on the record which, if credited, could permit a rational fact finder to conclude that the challenged personnel action occurred and stemmed from a politically based discriminatory animus." *LaRou v. Ridlon*, 98 F.3d 659, 661 (1st Cir. 1996) (quoting *Rivera-Cotto v. Rivera*, 38 F.3d 611, 614 (1st Cir. 1994)); *see also Cruz-Báez v. Negrón-Irizarry*, 360 F. Supp. 2d 326 (D.P.R. 2005). Consequently, even when circumstantial evidence may be sufficient to support a finding of political discrimination, plaintiffs must still make a fact-specific showing that a causal connection exists between the adverse employment action and their political affiliation. *See Aviles-Martínez v. Monroig*, 963 F.2d 2, 5 (1st Cir. 1992).

In showing the existence of a causal connection, the court has established that a plaintiff cannot prove that a defendant had knowledge of his political affiliation merely through:

> testimony of having been seen, or, for that matter, met during routine campaign activity participation, having been visited by the now incumbent defendant while said defendant was a candidate to the position he now holds, by having held a trust/confidential/policymaking position in the outgoing administration, by having political propaganda adhered to plaintiff's car and/or house, or through the knowledge of third parties.

*Roman v. Delgado Altieri*, 390 F. Supp. 2d 94, 102-03 (D.P.R. 2005) (citing *González-Pina v. Rodríguez*, 407 F.3d 425, 432 (1st Cir. 2005); *González-De-Blasini*, 377 F.3d at 85-86; *Cosme-Rosado*, 360 F.3d at 48; *Camilo-Robles*, 175 F.3d at 43-44; *Acevedo-Díaz v. Aponte*, 1 F.3d 62, 69 (1st Cir. 1993)).

Here, this is exactly the type of insufficient evidence upon which all of the plaintiffs, except for Torres, Borres, Cruz-Colón and Cruz-Salgado, rely.  First, thirteen (13) of the eighteen (18) primary plaintiffs state that Rodríguez-Adorno is, or was, aware of their political affiliations because he knows a third party whom is aware of their affiliations to the P.D.P., or, even more speculative, that their affiliations are known to the Mayor because their daughter, husband, or other family member is a well-known member of the P.D.P.  Second, six (6) of the plaintiffs argue that Rodríguez-Adorno must have been aware of their political affiliations because their houses or motor vehicles were adorned with P.D.P. propaganda during the campaign and that it is likely that either the Mayor, or someone whom the Mayor knows, saw this.  Third, plaintiffs point out that they have been seen at P.D.P. campaign functions by N.P.P. activists.  Fourth, other plaintiffs point to other factual scenarios too speculative for the court to credit, as it would require the court to accept conclusory allegations as true, which would be contrary to established law.[5]  *See generally González-Pina*, 407 F.3d at 432 (holding that, even if the opposing party mayor was aware of plaintiff's support for a rival mayoral candidate in the primary, that, by itself, is insufficient to establish political *animus*); *González-De-Blasini*, 377 F.3d at 85-86 (affirming the dismissal of a complaint because even though plaintiff was alleged to be a well known supporter of the N.P.P., had held a trust/confidential/policymaking position under the previous N.P.P. administration, and defendant had expressed interest in giving her position to a P.D.P member, this fell short of evidence that defendant knew of plaintiff's political affiliation); *Padilla-García v. Guillermo Rodríguez,* 212 F.3d 69, 74 (1st Cir. 2000) (a showing of political animus "requires more than

---

[5]  For instance, Rosario states that the Mayor must be aware of her political affiliation because on one occasion, when he went to the municipal building and greeted workers, he failed to greet either her or her co-worker.  She states, without foundation, that this was because they were P.D.P. affiliates.  Sotomayor states that the Mayor knows her political affiliation because, when she went to the Mayor's office to discuss the non-renewal of her appointment with him, she was left waiting from six a.m. until late in the afternoon and when confronted, the Mayor and one of his assistants mocked and dismissed her.  Plaintiff does not attest to the reason why she was mocked.  Similarly speculative are the averments of López, who states that prior to working for the Municipality he used to deliver groceries to the Mayor's family, and Dávila, who states that he grew up in the same neighborhood as the Mayor, and, therefore, the Mayor must have known of their respective affiliations to the P.D.P.  These assertions can be characterized as conclusory at best.

merely 'juxtaposing a protected characteristic-someone else's politics-with the fact that plaintiff was treated unfairly'") (citation omitted); *Cosme-Rosado*, 360 F.3d at 48 (holding that the statement of P.D.P major of intent to rid town of N.P.P. activists was, by itself, insufficient to generate genuine issues of material fact).

Additionally, plaintiffs' characterization of Rodríguez-Adorno's testimony as an "admission" as to his "reliance upon 'his people' (political machinery), in each 'barrio' to let him know the political affiliation of each individual" is a mis-characterization of Rodríguez-Adorno's deposition testimony.  **Docket No. 67,** at 20 ¶ 1.   In his deposition, Rodríguez-Adorno stated that "there are always people in the neighborhoods who know what political affiliation is each . . . person."  PSUF, at ¶ 5.  While the court "must scrutinize the evidence . . . giving [plaintiffs] the benefit of any and all reasonable inferences," to turn this statement into an admission that he, himself, relied on these people to inform him of the plaintiffs' political affiliations would  not only be far-fetched but would be an improbable inference, to which plaintiffs are not entitled. *See, e.g.*, *Suárez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000).

Therefore,  the court adopts the R & R, insofar as it recommends dismissal of all of plaintiffs' claims of political discrimination for failure to make out a *prima facie* case, except those asserted by Torres, Cruz-Colón, Borres and Cruz-Salgado, who proffered evidence that Rodríguez-Adorno was aware of their respective political affiliations.

### 2.     *Mt. Healthy* **Defense**

The Magistrate-Judge determined that Torres, Cruz-Colón, Borres and Cruz-Salgado, who were all employed pursuant to Law 52, made out a *prima face* case for political discrimination, but that defendants were entitled to summary judgment as they articulated a legitimate non-discriminatory reasons for not having renewed the plaintiffs' appointments. This is because defendants were legally obligated not to renew the contracts of those plaintiffs employed pursuant to a Law 52 grant.  Plaintiffs object, arguing that a finding that defendants had a legitimate and non-discriminatory reason for not renewing plaintiffs' employment contract is "clearly in error" given that it is "specifically contradicted" by the holding of *Acevedo-Feliciano v. Ruíz-Hernández*, 447 F.3d 115 (1st Cir. 2006).  The court disagrees.

As the court of appeals has stated, "[t]he Commonwealth of Puerto Rico established the Law 52 program more than twenty-five (25) years ago." *Acevedo-Feliciano,* 447 F.3d at 117. Under the program, Puerto Rico "subsidize[s] locally managed programs to ameliorate unemployment." *Id. (*citing *Gómez v. Rivera-Rodríguez,* 344 F.3d 103, 107 (1st Cir. 2003)). Municipalities do not have an automatic entitlement to Law 52 grants. *Id.* Instead, a municipality must submit a proposal describing how it will use the money and such proposals must be approved by the Commonwealth's Department of Labor and Human Resources (DLHR). *Id.* Once a grant is approved, the Commonwealth and the Municipality sign a contract specifying how much money the Municipality will receive, over what term, and how many jobs it will subsidize. *Id.* In the instant case, the Secretary of the Puerto Rico Department of the Treasury wrote to the previous Mayor, Francisco Rodríguez-Ortero, stating:

> [T]he employments created by the fund cannot be used to maintain temporary employees in a consistent manner, so that a system parallel to the merit system is created . . . . Nevertheless . . . said funds may be used if these services are clearly defined in the proposal submitted to the Department of Labor and Human Resources. In the case of employees appointed to these positions in the public service, the appointments may not exceed 12 months . . . . Under no circumstances may these funds be used to maintain employees . . . for more than 24 months, except the elderly . . . .

**Docket No. 38-6** at 24.

It is undisputed that Torres, Cruz-Colón, Borres and Cruz-Salgado were all employed under a Law 52 grant. Additionally, at the time each of their contracts expired, they had been employed for over twenty-four (24) months.[6] As such, defendants were forced to decide whether to renew said contracts, in clear violation of the terms of the grant, or not renew their employment. They chose the latter. For their part, plaintiffs present no evidence showing that the non-renewal of Torres, Cruz-Colón, Borres and Cruz-Salgado's employment contracts constituted a pretext for political discrimination. Instead, they claim that the court cannot rely on said argument for the following reasons: (1) it is discredited by *Acevedo-Feliciano*; and (2)  Torres, Cruz-Colón, Borres and Cruz-Salgado had an expectation of

---

[6] Torres had been employed for thirty-one (31) months; Borres for more than twenty (24) months; Cruz-Colón for thirty-seven (37) months; and Cruz-Salgado for thirty-three (33) months.

continued employment.  Both arguments are unavailing.

First, the ruling in *Acevedo-Feliciano* is inapplicable to plaintiffs' political discrimination claim since there was no political discrimination issue on appeal in that case.[7]  Second, as discussed below, Torres, Cruz-Colón, Borres and Cruz-Salgado had no expectation of continued employment as they were all transitory employees.  Third, even assuming, *arguendo*, that Torres, Cruz-Colón, Borres and Cruz-Salgado did have an expectation of continued employment, this has no bearing on whether defendants' decision not to renew their employment contracts were a pretext for political discrimination.  *See, e.g., Gómez*, 344 F.3d at 111 n. 5 (discussing the difference between a political discrimination claim, brought pursuant to the First Amendment, and a due process claim, brought pursuant to the Fourteenth Amendment).

Therefore, the court agrees with the recommendation by the Chief Magistrate-Judge to dismiss Torres, Cruz-Colón, Borres and Cruz-Salgado's political discrimination claims.

### B.    Fourteenth Amendment Claims

The Chief Magistrate-Judge recommended the dismissal of plaintiffs' due process claims because plaintiffs could not establish they had a reasonable expectation of continued employment.   Plaintiffs do not appear to object to the Chief Magistrate-Judge's recommendation to dismiss their procedural due process claim.  Nonetheless, the court briefly addresses plaintiffs' argument that Law 172 gives them a continued expectation of employment.

As the court of appeals articulated in *Acevedo-Feliciano*—a case involving a due process claim stemming from the termination of employment—"a public employee must first demonstrate that he has a reasonable expectation, arising out of a statute, policy, rule, or contract, that he will continue to be employed."  447 F.3d at 121.  The court determines whether such a property interest exists "by reference to state law."  *Id.* (citing *Bishop v. Wood*,

---

[7] In *Acevedo-Feliciano*, the court of appeals resolved whether a defendant's termination of Law 52 employment contracts, five months prior to the contracts' expiration dates, had violated the employees' procedural due process rights under the U.S. Constitution.  *See Acevedo-Feliciano*, 447 F.3d at 117.

426 U.S. 341, 344 (1976)).  While state law may create property interests, it is a separate question of federal law whether those interests rise to the level of a legitimate claim of entitlement sufficient to trigger procedural due process protections.  *Id.*; *see also Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978).  If the employee has such a state property interest, and that property interest rises to the level of a "legitimate claim of entitlement," then the employer cannot dismiss the employee without affording him due process of law. *Acevedo-Feliciano*, 447 F.3d at 121 (citing *Gómez*, 344 F.3d at 111).  "In the public employment context, the required process typically includes 'some kind of hearing' and "some pretermination opportunity to respond.'" *Id.* (quoting *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1985).  Under Commonwealth law, transitory employees have a property interest in continued employment only until the expiration of its appointment period. *Hatfield-Bermúdez v. Aldanondo-Rivera*, 496 F.3d 51, 60 (1st Cir. 2007) (citing *Dep't of Natural Res. v. Correa*, 18 P.R. Offic. Trans. 795, 804 (1987)).

In the instant case, plaintiffs assert that they have an expectation of continued employment and that if the Municipality was barred from renewing plaintiffs' contracts, then they were "compelled by Law 172 and Letter 5-2004" to award them permanent positions. A plain reading of both Law 172 and Letter 5-2004 shows that they are insufficient to create an expectation of continued employment.  Law 172 provides:

> Any transitory employee who has held until June 30, 2004, a position of fixed duration with permanent functions in the career service for a period equal to the probation period established for the class of the position he or she is to occupy, provided it is not for a period of less than six (6) months, in agencies covered under the Personnel System created by virtue of Act No. 5 of October 14, 1975, as amended, [former §§ 1301 et seq. of this title], shall acquire, effective on July 1, 2004, the condition of regular career employee in a position equal or similar to the one he or she held transitorily, subject to the conditions described in subsections (a) through (d) of this Section.

> (d) The head of the agency shall conduct an evaluation of the employee in a transitory position that complies with the provisions of the first paragraph of the present Section to acquire the condition of regular career employee, and shall certify that the services have been satisfactory. This last determination shall be made considering the evaluations of the employee and any corrective actions, if any, that appear on the record of the employee. Any transitory

> employee that has been affected by a determination of the agency regarding the
> rights granted to him/her by this Act may appeal to the Board of Appeals of the
> Personnel Administration System, pursuant to the provisions of Section 7.15 of
> Act No. 5 of October 14, 1975, as amended [former § 1395 of Title 3].

P.R. Laws Ann. tit 3, § 1461.  The statute makes clear that a transitory employee's conversion to a career position was conditional upon, *inter alia*, an appraisal by the Director of the Central Labor Advisory and Human Resources Administration Office and the head of the agency to which the employee belonged, and was to be determined by July 1, 2004.  *Id.*  As such, though plaintiffs are unyielding in their assertion that they had an expectation of continued employment pursuant to Law 172 and Letter 5-2004, a plain reading of the cited language shows that this was dependent upon the Municipalities' determination that said conversions were appropriate.[8]  Hence, neither Law 172 nor Letter 5-2004 support any of the plaintiffs' due process claims.  Therefore, plaintiffs' assertion that they had an expectation of continued employment in their positions because they should have been converted to career employees is unsupported by the record.

###    C.    Supplemental Jurisdiction

Finally, there is also a recommendation for the court to decline to exercise supplemental jurisdiction over plaintiffs' Commonwealth claims as plaintiffs' federal claims should all be dismissed.  Plaintiffs object, arguing that the federal claims should not be dismissed, and, therefore, the court should exercise supplemental jurisdiction over the Commonwealth claims.  As this court finds that defendants are entitled to summary judgment on the federal claims, in the interest of judicial economy and fairness to the litigants, the court declines to exercise supplemental jurisdiction over plaintiffs' Commonwealth claims.  *See Cullen v. Mattaliano*, 690 F.Supp. 93 (D. Mass. 1988) ("[I]t is the settled rule in this Circuit that in a non-diversity case, where pendent state claims are joined with a federal cause

---

[8] Further, even assuming that Law 172 did apply to the co-plaintiffs, it is clear that said determination was to be made prior to June 1, 2004, which was before Rodríguez-Adorno took office. While Letter 5-2004 provided an extension until January 10, 2005, since Rodríguez-Adorno was not sworn into office until that same day, he cannot be held liable for not having decided to convert plaintiffs to career employees as he had no opportunity to do so.  Hence, plaintiffs' theory that they were entitled to be converted to career appointees fails.

of action and that the federal cause of action is [dismissed] . . . the pendent state claims should be dismissed.").

    **D.**    **Ninth and Tenth Amendment Claims**

    Although defendants did not move for summary judgment as to plaintiffs' Ninth and Tenth Amendment claims, the court dismisses these claims as well.  Plaintiffs make no effort, in the complaint or any other pleading, to establish that they are entitled to relief pursuant to either the Ninth or Tenth Amendment.  *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  Additionally, even if plaintiffs allusion to the Ninth and Tenth Amendments claims were not perfunctory, they could not prevail on the same.  The Ninth Amendment states: "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. Amend. IX.  The court of appeals has explicitly stated that the Ninth Amendment "does not create substantive rights beyond those conferred by governing law."  *Alvarado-Aguilera v. Negron,* 509 F.3d 50, 53 (1st Cir. 2007).  Thus, plaintiffs cannot assert a Ninth Amendment claim.  The Tenth Amendment states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. Amend. X.  The court of appeals has expressly stated that "private citizens lack standing to maintain Tenth Amendment claims."  *Medeiros v. Vincent*, 431 F.3d 25, 34 (1st Cir. 2005) (citing *Tenn. Elec. Power Co. v. Tenn. Valley Auth.*, 306 U.S. 118, 144 (1939)).  As plaintiffs are private citizens and allege no claim against a federal actor, their Ninth and Tenth Amendment claims must be **DISMISSED**.

**V.**    **Conclusion**

    In light of the foregoing, the Chief Magistrate-Judge's Report and Recommendation (**Docket No. 64**) is **ADOPTED** in full.  Consequently,  defendants' motion for summary judgment (**Docket No. 28**) is **GRANTED,** and plaintiffs' federal claims brought pursuant to

the First, Fifth, Ninth, Tenth and Fourteenth Amendments are **DISMISSED WITH PREJUDICE.**  Additionally, plaintiffs' Commonwealth claims are **DISMISSED WITHOUT PREJUDICE**.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 9th  day of March, 2009.


**S/AIDA M. DELGADO-COLÓN**
**United States District Judge**